BROWN v. DETROIT UNITED RAILWAY.

1. AMENDMENTS—LIMITATION OF ACTIONS — NEGLIGENCE — STREET RAILWAYS—OPERATION OF CARS.

An amendment of plaintiff's declaration, allowed at the trial, after a new action had been barred by the statute of limitations, so as to change the allegations of negligence from failure to keep a switch in repair, to negligence in operating defendant's street car at a dangerous rate of speed, so that the car split the switch and injured plaintiff, the rear wheels leaving the track and entering on the switch, was a proper exercise of the court's discretion.

2. STREET RAILWAYS — EVIDENCE — ORDINANCE OF CITY — NEGLIGENCE.

On the trial of a personal injury action for so operating a street car that its rear wheels left the track at a switch and the car swung across the street striking an automobile in which the plaintiff was riding, it was competent, on the issue of negligence, to introduce an ordinance of the city in which the accident occurred requiring the motorman to reduce the speed and get the car under control, in approaching a switch or curve; the ordinance could not be said to have been intended for the benefit of passengers only.

3. SAME—RULES—STREET CARS, OPERATION OF.

But rules of the defendant street railway fixing the care required of its motormen and warning them to approach switches with the car under control, were inadmissible in evidence: no prejudice, however, resulted from the receipt in evidence of such rules, as to the defendant which claimed that its car was not running too rapidly and that the motor car ran into the street car.

4. DAMAGES—VERDICT—PERSONAL INJURIES.

$7,500 for injuries to plaintiff's head and permanent injuries, held, under the evidence, not so excessive as to require a reversal of the judgment.

Error to Wayne; Van Zile, J. Submitted October

17, 1913.   (Docket No. 57.)   Decided March 27, 1914.
Rehearing denied June 4, 1914.

Case by Rose E. A. Brown against the Detroit
United Railway for personal injuries. Judgment for
plaintiff of $7,500. Defendant brings error. Affirmed.

*Corliss, Leete & Moody (William G. Fitzpatrick,* of
counsel), for appellant.

*J. Emmet Sullivan* and *Frank H. Watson,* for appellee.

MOORE, J.   The plaintiff was riding in the automobile of one Mabel Wright on the evening of December
5, 1908, between 4 and 5 o'clock.   They went down
Woodward avenue from the Grand boulevard, intending to go to the retail shopping district, passing under
the railroad viaduct.   Defendant has a double-track
line on Woodward avenue, and, at the time of the accident mentioned later, had a switch connection with
its easterly track for the purpose of turning cars onto
a loop which ran across the south-bound track and
the street, and around a building, making a complete
loop, so that north-bound cars making the loop could
go down town.

We quote from the brief of counsel for appellant:

"All interurban traffic leaving the city via Woodward avenue ran over this switch.   At about 4:25 p.
m. a limited 'Romeo Division' interurban car, which
had taken air south of Piquette avenue, was proceeding northerly in the direction of the switch point,
when it was observed by Miss Wright, the driver of
the automobile.   Just where this observation was
made, and the speed of the interurban and automobile
at that moment, are matters that are in dispute on
the evidence.

"Plaintiff claimed that when Miss Wright first saw
the interurban it was proceeding northerly at from
15 to 20 miles an hour, and was then at or about the

north curb of Piquette; that the automobile was about at the crest of the hill coming up out of the subway, and the auto was running at from 8 to 10 miles an hour; that as she approached the curve track she slowed down, and within two or three feet of the northerly rail of the curve she stopped her auto completely until she observed the front trucks of the interurban go over the switch, when she started up again, but had scarcely gotten under way when the rear end of the interurban swung westerly across Woodward avenue and upon and against the auto, badly damaging it and seriously injuring herself and the driver, Miss Wright.

"It is not disputed that the rear trucks of the car split the switch, but defendant claimed that the interurban was not going to exceed four or five miles an hour; that the switch was properly set for northbound traffic; that as the front trucks struck the switch the power was turned off; that, as soon as the motorman could know that the rear trucks had split the switch, he applied his air; that the brake rod broke; that he then reversed the car; that it stopped at once; that it lay angling across both tracks and the avenue at about 15 degrees from the north-bound track with the front trucks on the north-bound track and the rear trucks on the curve track, all eight wheels being on the track, and there being a space of from 8 to 10 feet between the westerly end of the car and the west curb of Woodward avenue, when it finally came to rest; that the automobile ran into the car after it had come to rest; and that the auto was being operated at the rate of from 18 to 20 miles per hour. Defendant also claimed that the reason for the splitting of the switch was not proven, or that at least it was not shown to have been the result of any of the causes alleged in the plaintiff's declaration.

"Plaintiff's declaration was amended at the trial over objection, the case went to the jury, who rendered a verdict for plaintiff of $7,500, upon which judgment was duly entered. Motion for a new trial was made and denied, and the cause is brought here on error."

There are many assignments of error. We again quote from the brief:

"The plaintiff should not have been allowed to amend her declaration on the trial. The statute of limitations had run against all new matter necessary to be pleaded in order to admit evidence and sustain a recovery and all new items of damage. The cause of action, if any ever existed, arose on December 5, 1908. The statute had run December 5, 1911. The amendments were allowed on the trial, which commenced November 17, 1912."

The material parts of the declaration as amended are as follows; the amendments being in italics:

"And the plaintiff further avers that thereupon it became the duty of defendant to properly and safely construct said loop and switch, *and in maintaining the said loop and switch* connecting therewith and appertaining thereto, to keep the same in due repair, *especially that portion* of said loop and switch by which cars going northward on the east track aforesaid are caused to be switched onto said curve, or loop, to wit, the switch and switch point thereof, and the hinges securing the same to the said curved track, so that the said switch would not become so loose and unstable as to be shaken out of place by the vibrations and shocks of approaching cars, thereby causing the said cars to be thrown over, without warning, onto said loop and approaches to same; and it was the duty of the motorman, or agent or servant of the said defendant in operating its cars going northerly on said east track, on approaching the said switch connecting as aforesaid with said loop, to slow up his car and stop the same, keep a sharp lookout, and otherwise exercise due care to see that the said switch was in proper position not to permit his car operated by him from going over onto the said loop suddenly and without warning, to persons on foot or in vehicles using that portion of said Woodward avenue between the said east track and the westerly line of said Woodward avenue; *and it was the duty of said motorman, agent, or servant to approach this said switch at a slow rate of speed, in order that the car should be under complete control of said motorman in order that said car would not split said switch and leave the east track and run over and onto said loop switch,*

and in order that if said switch was not in order, and if said car should split said switch and start to leave said east track and go over onto said loop track, that said motorman could immediately stop his car and avoid any danger that might occur to the passengers in said car and to others lawfully using said street for traffic. Plaintiff avers that the city of Detroit by ordinance approved August 15, 1899, prescribed the manner in which cars should approach switches, and provided among other things, by section 3 of said ordinance, that *'it shall be the duty of the motorman in charge of any car in said city to slacken the speed of said car when rounding any curve or approaching any switch, in order that said car shall be run around said curve or upon said switch with the least possible danger to the passengers upon said car; and the motorman shall use power sufficient to enable the car to turn the curve and no more; which said ordinance was on said 5th day of December, 1908, in full force and effect; and it then and there became and was the duty of said defendant by its said motorman, agent, and servant, to observe said ordinance and use due care and slacken the speed of said car and have his said car under complete control, so that he could immediately stop the same and avoid accidents resulting from said car splitting said switch and leaving said east track over onto said loop and switch;* and it was the duty of said defendant, its agent and servant, to approach this said switch at a slow rate of speed, so as not to permit the car suddenly to leave the east track and be thrown out over and onto the said loop and switch. * * * In addition to the duties aforesaid, it thereupon became and was the duty of the said defendant, in approaching said switch, to cause its car to slow in its speed and to bring said car to a standstill and to adjust the said switch so that the car would not go over onto said loop and collide with the said automobile in which said plaintiff was riding, and it was the duty of the defendant, its motorman and agent, both by reason of the ordinance of the city of Detroit, aforesaid, and at common law, to cause the said car to approach said switch slowly, so that the said car, or any part thereof, would not go over onto said loop and collide with said

automobile, and in order that said car as it approached *said switch would be under complete control, so that it could be instantly stopped by the motorman of said car,* and thus avoid injury to this plaintiff provided it did split said switch and go from said east track over onto said loop, and it was the duty of the said defendant to properly construct and keep said switch in good repair, and to prevent it from becoming loose and liable to be shaken by the jarring and vibration of approaching cars, thereby displacing it and causing the said car to leave the said east track and go onto the loop aforesaid and collide with said automobile. And plaintiff alleges that said defendant did not do its duty in the premises, but, on the contrary, made a breach thereof, in that it carelessly and negligently, and *in utter disregard of the ordinance aforesaid or reasonable prudence, did not slacken the speed of said car as it approached said switch;* but, on the contrary, carelessly and negligently caused its said car to approach the said switch of said curve at a high and dangerous rate of speed, to wit, 20 miles per hour, and at a rate of speed much in excess of the ordinance of the city of Detroit then in operation, which limited the speed of cars within the three-mile circle (said switch being within said three-mile circle) to an average of 10 miles per hour for the whole length of any route within said circle, causing the said switch, by the vibrations and jarring of its said cars, to be shaken loose, so that the wheels of the rear truck of the said car split the said switch, and the car swung violently over on the north track of the said curve or loop, *and carelessly and negligently did not slacken the speed of said car, but run at said high rate of speed and approached and onto said switch at said high rate of speed, so that said motorman did not have said car under complete control in order that he might stop the same immediately if said car did split said switch and go from the east track over onto said curve, and thus avoid injury to the passengers on said car and to others and to this plaintiff particularly, who was at the time lawfully and with due care using said street as heretofore and hereinafter set forth.* And plaintiff further avers that the said defendant did not properly and safely construct the said switch connecting the east track

of its main line with said loop, nor keep the same in good and due repair, but carelessly and negligently allowed the same to become loose, worn, and easily shaken and displaced by the vibration and jarring of the approaching cars, so that it became liable to throw the said car, or some portion thereof, over onto said loop suddenly and without warning; and the said motorman or servant of the said defendant in charge of said car of said defendant did not stop said car or slacken its speed, and did not adjust the said switch which was not in proper position to prevent the wheels of said car from splitting same, in consequence of which, and *because of the great speed aforesaid,* the rear trucks of said car split the said switch and proceeded with great rapidity and violence over onto the north track of the said switch and loop."

It is clear that the cause of action, if any, grows out of what happened to Mrs. Brown on the evening of December 5, 1908, while she was in the automobile, when the interurban car and the automobile came in contact with each other. The original declaration and the amended declaration relate to the same injury growing out of the same collision. The ruling of the trial judge is justified in what is said in *City of Detroit* v. *Wayne Circuit Judge,* 125 Mich. 634 (85 N. W. 1), and the cases cited. This case is so accessible we think it unnecessary to quote from it. See, also, *Smalley* v. *Terra-Cotta Co.,* 113 Mich. 141 (71 N. W. 466).

This conclusion makes it unnecessary to discuss many of the assignments of error as to the admission of testimony.

It is said the court erred in allowing the introduction of the ordinance of August 15, 1899, concerning the duty of defendant to passengers in the operation of cars over switches. It is urged the ordinance was incompetent as bearing upon the question of negligence, and also that it was passed for the protection of passengers, and not for the safety of persons in

the street.  In *Mollica* v. *Railroad Co.*, 170 Mich. 96 (135 N. W. 927), it is held that the violation of an ordinance is admissible as bearing upon the question of negligence, citing several cases.  In *Morgan* v. *Railroad Co.*, 162 Mich. 573 (127 N. W. 683), a statute for the regulation of the making up of trains was construed.  The trial court held it had no application to the person in the street, but was passed for the protection of passengers only.  This court held it was a police regulation, and the beneficial effects of this statute to travelers upon the streets and highways are quite as apparent as they are to passengers, and the trial judge gave the statute too narrow a construction.  We think the same principle applies here.

We now approach a question which presents difficulties in its disposal.  The plaintiff was allowed to introduce in evidence rules of the company reading as follows:

"Rule 336.    Cars must approach all switches cautiously.    Motormen must be sure they are safe before passing them, and must exercise extreme caution whenever cars occupy switches, especially passenger cars taking on and off passengers.    In such case cars must be under complete control.

"Rule 337.    Flying or running switches is forbidden.

"Rule 229.    Motormen will approach switches with cars under complete control."

Not much emphasis was placed upon the objection to the admission of these rules, and the trial judge thought them admissible for the same reason that the ordinance was admissible.  Under *Dixon* v. *Railway Co.*, 155 Mich. 169 (118 N. W. 946), it must be held that the rules were not competent.

The question yet remains:  Was their admission reversible error?  We have already called attention to the claims of the respective parties as stated by counsel for appellant.  We cite some of the testimony.

Mabel Wright, after testifying to driving an automobile six years, some of the time making 75 and 100 miles a day through different parts of the city, and that she had learned to judge closely the rate of speed of moving objects, said:

"We started from the house somewhere between 4 and 5 o'clock; I should judge about half past 4. Drove down to Woodward avenue from Third avenue and West Grand Boulevard, I should judge, about 8 miles or 10 miles an hour. Turned Woodward going south about the same speed. We came up the viaduct and came to where the car turns in there, and I saw a big car coming at what seemed to be a very high rate of speed. It was coming at a rate of 15 or 20 miles an hour. I always take the precaution before going over the track to slow up, and I saw this big car coming. I didn't know whether it was going to turn into the switch. I saw the front truck pass over the switch, and naturally supposed the car was going on. The next thing I saw the rear end swing around. I had approached quite near that curved track there, and I checked my automobile. As soon as I saw that the front truck crossed, I immediately put on my speed, sent the car ahead. I did not shut off my power at all, so it immediately started right up.

"Q. Why didn't you get out of the way when you saw the hind trucks had split the switch and was coming towards you?

"A. It would be impossible; I could not get out of the way. I was going ahead as fast as I could.

"Q. About what rate of speed were you moving at that time?

"A. I could not say; the car was upon me, and I had to do that way. The minute I saw the car, it was on me instantly. I did not have any opportunity to get out of its way. I was on the front seat. It struck my car on the side, from the condition the car was in. The wheels were off and the frame was bent, absolutely demolished. It left me behind the steering wheel, bound in there. I was not able to extricate myself after the accident; they dug me out. I did not know where Mrs. Brown went to; I didn't have time to. After I had been extricated, I found Mrs. Brown,

after I had my head stitched up and taken home. They took us both in the Cadillac, and put some bandages on us. Mrs. Brown had her head bandaged; we were both in turmoil. Mrs. Brown appeared there at that time to be delirious. They took us both home in a car. I don't know who the car belonged to; to the Cadillac Company I think. Two gentlemen took us home. Mrs. Brown went with me. When she got home, her appearance at that time was delirious, knew nothing of what she was doing or saying. I know what doctor it was that attended us at the Cadillac. I remember what he told me. It was Dr. Kelley. After we got home, Mrs. Brown was immediately put to bed, and a nurse sent for immediately. I went to bed. Mrs. Brown remained in that delirious condition for many weeks.   *   *   *

"*Q.* Have you ever driven that car since that time?

"*A.* No, sir; nor any one else."

The testimony of the plaintiff is much briefer in relation to the accident than we have quoted from Miss Wright, but it is much in the same line. There was other testimony on the part of plaintiff tending to sustain her claim as to the speed of the car. One of the witnesses testified the car was going at least 15 miles an hour.

"I was accustomed to riding upon street cars in Detroit at that time. On the 5th day of December, along about 4 o'clock or a little after, I took a north-bound Woodward avenue car, going to Rochester— one of the ordinary big suburban cars that go out Woodward avenue.

"*Q.* Do you recollect the accident very clearly, Mr. Schorn?

"*A.* Most decidedly.

"*Q.* Were you on that car when the car split the switch?

"*A.* I was standing just inside the rear door, or rather in the rear doorway.

"*Q.* What force did it use in splitting that switch, so far as you were concerned? What did you observe?

"*A.* Why, personally, I was thrown from the car

with sufficient violence to suffer an injury to this day.

"*Q.* Did it throw you completely from the car?

"*A.* It left me in the middle of the track, where the rear part of the car was; the car was over to the outside of the street and practically blocked the entire street.

"*Q.* Were you thrown clear from the platform?

"*A.* Right in the center of the right-hand car track going out of the east track, where the rear wheels over which I had been standing had passed. The rear wheels were almost over the curb on the west side of the street.

"*Q.* Now, before going out there did you know of the car stopping before it split the switch, the last stop it made?

"*A.* It stopped one block south from where the accident happened.

"*Q.* Did it stop at all after it stopped at that distance, of about a block, until it split the switch?

"*A.* When we left the air station, the motorman threw his control over as far, I should say, as possible. * * *

"*Q.* You may state whether the car picked up speed immediately on leaving this air station?

"*A.* The car picked up speed very rapidly.

"*Q.* Were you accustomed at that time to judge and estimate the speed of street cars and of moving objects?

"*A.* Yes, as far as a layman can judge such a thing. * * * I should say at the time it was going at the minimum of 15 miles per hour. I was paying particular attention to the way the car picked up speed and was running at the time, because I had to brace myself to take care of the momentum of the car. I was braced at the time they struck the switch. I had my left hand against the opposite side of the doorway, with my back toward the east.

"*Q.* Now, state what the fact was as to whether that car slackened up any in rate of speed as it approached the switch.

"*A.* The car did not slacken the speed from the time it started. The speed increased from the moment it started until the time of the accident."

On the part of the defendant, the city roadmaster

of the defendant was called as a witness. He did not see the accident, but described the mechanism of the switch. On his cross-examination the following occurred:

"*Q.* If the switch was turned to the left and locked, thus locking the switch, and there was nothing the matter with the switch, it was not affected at all, and the car was running at a slow rate of speed over the switch, would there be any possibility of it splitting the switch and going in on the curve?

"*A.* I do not see that there would be; no, sir."

The conductor of the car was sworn and testified on his direct examination in part:

"*Q.* Will you state to the jury how fast, in your opinion, the car was going when it got so that the front end of the car was near the switch point south of the switch point, according to your best judgment.

"*A.* About five miles.

"*Q.* You mean to say about five miles an hour?

"*A.* Yes, sir.

"*Q.* What was the first thing you knew of an accident happening when you came along?

"*A.* I did not know.

"*Q.* When did you first know that anything had happened?

"*A.* After the rear trucks split the switch.

"*Q.* After the rear trucks took the switch, what did you do?

"*A.* I was standing just inside of the door at the rear end of the car.

"*Q.* And then what did you do?

"*A.* I got off and went to see what was the matter and take the witnesses or somebody who saw the accident. When I first got off, I went to the automobile. By the time I got off, the automobile was there then. I got off the rear way. I do not remember where the wheels of the rear truck were at that time. The accident happened about 4:25.

"*Q.* You may state whether the car went any distance straight after you felt the rear wheels go onto the curve track, how soon it stopped?

"*A.* Why, I should judge about five feet."

The motorman was sworn.   He testified, in part:

"As I approached the switch I observed it, and knew what condition it was in.   My observation showed me that the point of the switch was tightly against the rail, I should say all right for the cross-over as far as my ability and knowledge of the switch, as far as my duty was concerned, it was fair to go ahead. At the time I pulled away from Piquette avenue, I had in mind the switch that I was coming to.   I am able to tell the jury about how fast the car was going, as the south end of it approached that switch point and got near to it, about four or five miles an hour, about four miles an hour as the car was going along.   My front trucks went on the switch.   Nothing was wrong with the front trucks as they went on.   Then I threw off my current.   I never have any current on or juice on when the hind end strikes the switch.   The next thing I felt the hind end of the car going this way to the south.   I cracked my air on.   The result was I broke my brake in two.   Then I pulled the reverse.   It was right there, and I pulled it.   The effect was she stopped instantly.   *   *   *   I jumped out of the front end of the car and ran to the barn for a bull rope, to pull it right back on the track.   When I was running for that bull rope, I heard a crash that drew my attention, but I was still hollering for the bull rope, and when I got back the automobile had run into the back end of the car, and, directly I stepped around the car, I saw the automobile was considerably damaged.   I did not hear the noise, or any crash, or anything before I got off the car; everything was practically silent.   With reference to the rear end of the car when I heard this crash, I was about Amsterdam avenue hollering for the bull rope.   When I saw that, I run around there.   I saw the people there, and I ran to see what had occurred.

"*Q.* State to the jury how far your car went north after the rear wheels split the switch, when you felt them split the switch.

"*A.* Before I had felt it, that it would notify me that the trucks had struck the south-bound track, but after it left the south-bound I did not go over 8 feet, so that it left a space of 8 or 10 feet between the back end of the car and the curb, and that was room enough

for anybody to drive around behind.  There was that much space; there was 8 feet anyway.  The car quit swinging around before I ran for the bull rope.  It had stopped before I heard the crash.  I had to run about 100 feet, I presume.  When my car came to a rest, it was north of Amsterdam avenue, and the car barns at that time were south of Amsterdam.  I had gotten up to Amsterdam avenue when I heard the crash."

Other witnesses were sworn whose testimony tended to corroborate the claim of the motorman.

The trial judge, in his charge to the jury, after stating the claim of the plaintiff, substantially as stated in the brief of appellant's counsel, said to the jury:

"Now, the defendant's claim is an entirely different claim.  The defendant claims that Miss Wright was driving the automobile, that is not disputed, that these two parties came up to the automobile, that the car ran upon the track, and that the front wheels went upon the main track as they intended it, and that, when the hind truck came to the switch, it was split and the car swung around.  Whereas, the plaintiff claims that the car was swung around so that there was not room enough to pass between it and the curb.  The defendant claims that the car swung around and stood across the track at an angle, that has been described, and that there was about eight or ten feet space between the curb and the end of the car, and a space entirely sufficient for the automobile with the ladies that were driving it to pass through, and that the street car came to a rest or stop, and that after it had stopped, and after stopping for a sufficient time for an accident to be avoided by the person driving the automobile had they used diligence, that, after it had stopped, this driver of the automobile, Miss Wright, ran the automobile into the car at rest upon the track, and that the accident, and injury, if any, was occasioned by reason of the negligence of the driver of the automobile, and that the driver of the car for the company, the defendant, was entirely without

179 MICH.—27

negligence, because the car was standing at rest upon the track at the time it was hit by the automobile, and that it might have been avoided by the plaintiff or the driver of the automobile.

"Now it appears in this case, by undisputed proof, that the plaintiff in this case, Rose E. Brown, was riding in the automobile in question, which was being driven by Miss Wright, as a voluntary passenger at the time of the accident. Therefore, I charge you, as a matter of law, that the negligence of Miss Wright, if you should find her guilty of negligence in the operation of this automobile, or in any way contributing to the accident, must be imputed to the plaintiff. That is to say, the negligence of Miss Wright would be the negligence of the plaintiff, so far as this case is concerned. The burden of proof, the burden of proving the case as alleged in the declaration of the plaintiff, rests upon the plaintiff. The plaintiff in order to recover must prove by a preponderance of proof that the defendant on the occasion in question was guilty of negligence in the manner and form set forth in her declaration, and that such negligence was the direct or proximate cause of the injury complained of, and she must further show by the same sort of proof that she, the plaintiff, and said Miss Wright, the driver of the automobile, with whom she was riding, were free from negligence or from any negligence which would contribute to the accident or the injury. These are the two propositions that must be made out by the plaintiff as stated, that this injury, this accident, was caused by the negligence of the defendant as they have alleged in their declaration, and, second, that the plaintiff and Miss Wright were in no way guilty of negligence which in any way contributed to the accident; that they, being free from negligence, suffered this injury solely because of the negligence of the defendant. I therefore charge you that if you find as a matter of fact that the driver of this automobile, on the occasion in question, drove the automobile into the street car after the same had come to a stop or rest, as is claimed by the defendant, * * * and that resulted in the injury, then the plaintiff cannot recover, because in such cases there would be no proof of negligence upon the part of the defendant. * * *

"Now, as to the claim of negligence in the operation of the car: Should you find in this case that the accident resulted because of running this car at an excessive and negligent rate of speed over this switch, that is, at such a rate of speed that an ordinarily prudent man under just such circumstances would not adopt, and you further find that neither the plaintiff nor the driver were guilty of contributory negligence, then in that case your verdict should be for the plaintiff. Now, I have already said to you, and perhaps may repeat it, the diligence which is required, the care and caution which is required in this case, is ordinary diligence and ordinary caution. It is that care and that caution which ordinarily prudent men would adopt under just such circumstances. It is that care and caution in this particular case I have just mentioned that an ordinarily prudent motorman upon this particular car, under just such circumstances as this, would adopt in running that car. Now, the motorman, the servant of this defendant, must use ordinary care in the running of this car; as I say, should you find that this car was run at an excessive or negligent rate of speed, and that, because of this, this accident occurred, and it occurred without any contributory negligence on the part of the plaintiff, then and in such case your verdict should be for the plaintiff. * * *

"Now, gentlemen, to sum up briefly, if you find in this case that this claim or theory of the defendant is true that this car was thrown around by the splitting of the switch, and that it remained at rest some eight or ten feet away from the curb, and at a distance where an automobile could have passed it, and should further find that that car was there at rest, and at rest for a sufficient time for these persons to have stopped this automobile and avoided this accident, and that it came down there at such speed and ran into the car there at rest upon the track; if you find that claim to be true, then the plaintiff cannot recover, and your verdict should be for the defendant."

It is clear from what we have quoted from the brief, from the testimony, and from the charge of the judge, that the case was tried by the plaintiff upon

the theory that the car approached this switch at a rapid rate of speed, which caused the switch to split; that the rear part of the car was thrown around and against the automobile, crushing it in and doing the injury. On the part of the defendant, the case was tried upon the theory that the car approached the switch at the rate of four or five miles an hour, and under control, and that, when the rear truck split the switch, the car was instantly stopped with the rear of the car eight or ten feet from the curb, and that after the interurban car was stopped there was plenty of space between it and the curb for the automobile to pass, that Miss Wright, instead of taking this opening, ran the automobile into the car. These theories were wide apart, and we do not think the admission of the rules affected the result, and therefore we say their admission does not constitute reversible error.

It is said the case should be reversed because the verdict is excessive. The trial judge filed written reasons for overruling the motion for a new trial, and declined to interfere upon this ground. The injury occurred in December, 1908. The case was tried in November, 1912. One of the witnesses testified in relation to the plaintiff:

"I was acquainted with her before she was hurt. I had known her prior to that some 5 or 6 or 7 years. She had lived with me most of the time. I know of her general health prior to the accident. She was the most splendid type of woman I ever met; I never knew of her being sick. I went with her as a companion. Prior to being injured, she could walk for miles. I knew her to go to Belle Isle, walk across the bridge, walk around the island, and walk back, and be in splendid condition. I have known her to walk down to Palmer park, walk down to the 7-mile road, and then walk back, and would not even know she was tired. She walked erect. Most perfect carriage and most perfect figure prior to the injury."

There was testimony that she was confined to her bed three months, and to her house seven months, as the result of the injury. Her attending physician, testifying at the trial nearly four years after the accident, says that in his opinion she never will be well. She was a witness in her own behalf and describes in detail what followed her injury. Some of her testimony is not connectedly given. Counsel did not cross-examine her. There was testimony offered on the part of the defendant tending to show she was not much hurt, but there was an abundance of testimony, if believed, to justify the verdict. The jury and the trial judge had the great advantage of seeing and hearing the plaintiff, and the other witnesses, and we are not inclined to say as a matter of law that a new trial should be granted because of the amount of the verdict. We have considered the other assignments of error, but it is not necessary to discuss them.

Judgment is affirmed.

McAlvay, C. J., and Brooke, Kuhn, Stone, Ostrander, Bird, and Steere, JJ., concurred.